IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 23, 2010

## STATE OF TENNESSEE v. BARBARA ANN RIGGS

**Appeal from the Criminal Court for Knox County**
**No. 84997     Mary Beth Leibowitz, Judge**

**No. E2009-00820-CCA-R3-CD - Filed May 26, 2010**

The Defendant, Barbara Ann Riggs, was found guilty by a Knox County jury of theft of property valued at $10,000 or more but less than $60,000, a Class C felony. See T.C.A. §§ 39-14-103; -105(4).  The trial court imposed a Range I, six-year sentence to be served on probation consecutively to a one-year sentence in another case and set the amount of restitution at $28,600.95.  In this appeal, the Defendant argues that the evidence was insufficient to support her conviction, that the trial court erred in enhancing her sentence based upon enhancement factors that were not found by a jury to exist beyond a reasonable doubt, and that the court erred in awarding restitution for attorney's fees and accountant's fees the victim incurred as a consequence of the crime.  We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

Mark E. Stephens, District Public Defender, and Gianna Maio and David Gall, Assistant Public Defenders, for the appellant, Barbara Ann Riggs.

Robert E. Cooper, Jr. , Attorney General and Reporter; Matthew Bryant Haskell, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Kevin James Allen, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The events in issue occurred during the course of the Defendant's employment as a bookkeeper for Tile Sensations, which is owned by Jennifer Neil.  Cash, checks, gift cards,

and a company debit card were used for purchases and the transactions were entered into the company's accounting program in a way that concealed the nature of the transactions.

At the trial, Jennifer Neil testified that she was the owner of Tile Sensations and that she hired the Defendant as a part-time bookkeeper. She said the Defendant left to work for another employer but returned to Tile Sensations on a full-time basis in August 2005. Ms. Neil said she was overloaded with responsibilities, had recently divorced a violent husband, was a single parent, and was running a struggling company at the time. She said she welcomed the relief afforded her by having the Defendant take on primary responsibility for bookkeeping and also perform other office tasks. She said she trusted the Defendant and did not worry about placing the business's finances in the Defendant's control. She said that the Defendant was issued a laptop computer that belonged to the business and that the Defendant was able to access the business's QuickBooks software from home.

Ms. Neil identified a copy of a debit card for the company's bank account. She said that at the Defendant's urging, she obtained debit cards for herself and the Defendant. She said the debit card issued to the Defendant was for business purposes, such as office supplies or C.O.D. payments to a vendor. She said the Defendant was added to the business's bank account as a person authorized to sign checks. She said that after the Defendant began full-time employment, the Defendant also volunteered to assume the responsibilities for reconciling the monthly bank statement.

Ms. Neil said that on the Monday after Thanksgiving, the Defendant told her that the Defendant had gone shopping but left her personal checkbook or credit card at home and that the Defendant had used her company debit card for personal purchases totaling approximately $1200. She said that the Defendant pledged not to do it again and that the Defendant said she would repay the money. She said she was surprised that the Defendant would have done this because there was no extra money in the checking account. She stated that she believed the Defendant's promise to repay the money, that she assumed the Defendant did so, and that she had no idea the Defendant would not repay the money.

Ms. Neil testified that business had been brisk in November and December 2005. She said that everyone worked hard during this time and that the business was closed early on December 23 and remained closed until January 2. She said the employees were not paid for this time off work unless they chose to use their accrued vacation time. She said the Defendant would not have worked during this time and would not have been paid because the Defendant was a contract employee and did not accrue vacation time.

Ms. Neil testified that she hoped that there was enough money in the checking account on December 23 for all of the business's checks to clear and that there would be some money

left to begin business in January. She said the company's finances were "really, really tight" and that before the Defendant took over the accounting, Ms. Neil called the bank every day to see whether any checks had bounced. She said she had invested her inheritance in the business to keep it afloat financially.

Ms. Neil testified that the Defendant was on a cruise from January 6 through January 14 and that the Defendant returned to work on January 17. She said that while the Defendant was gone, she discovered that the Defendant had written a check to herself for an amount that was identical to the sum that had recently been paid to a creditor. She said she began discovering irregularities in the business's QuickBooks accounting program. She said that each user of QuickBooks had a unique password, that the Defendant had a password of her own, and that both she and the Defendant knew the password to use the program as the system administrator. She said that "audit trail" reports were generated once she discovered the irregularities. She said these reports detailed the date, time, and user identity for every creation of an entry, viewing of an entry, and change to an entry.

Ms. Neil testified that the Defendant's pay when the Defendant began working full-time was $750 per week. She said that she discovered by reviewing QuickBooks that beginning on October 24, the Defendant began paying herself for pay periods ending in the future. She said that by December 8, the Defendant had already paid herself through December 30. She said the Defendant should not have been paid for the period ending December 30 because that was when the business was closed. She said that on December 29, the Defendant also paid herself a second time for three time periods, in a total amount of $2250. She said that QuickBooks reflected that this transaction had been entered on December 28 by the administrator and that she would not have been available at that time to have entered the transaction. She said the Defendant again paid herself in advance on January 3 for the pay periods ending January 6 and January 13. She said the Defendant should not have been paid for the week ending January 13 because the Defendant had been on a cruise that week.

Ms. Neil testified that the business was repaying her for the loan of her inheritance in the amount of $1200 per week, although she did not always take the money. She identified a cancelled check dated November 23, 2005, made payable to the Defendant in the amount of $1200 and reflecting that it was for "weekly transfer." She said the Defendant was not entitled to a $1200 weekly payment. She said that the signature on the November 23 check was neither hers nor the Defendant's but that the check was endorsed with the Defendant's signature. She said that this payment was entered into QuickBooks by the administrator as a payment to Ms. Neil and that she did not receive that payment. She said that two weekly transfers to her were listed in Quickbooks for December 3 but that she would not have received two transfers for the same time period. She said that another $1200 check payable

to the Defendant was issued on December 8, that her name was forged on the signature line, and that the cancelled check contained the Defendant's signature on the endorsement. She said that all of the checks in question were processed by Maryville Credit Union, where the Defendant banked. She said she would not have received money by check for repayment of the loan because this was done through an account transfer with the bank. She said that the check numbers for the checks written to the Defendant were not entered into Quickbooks and that the space for the check number where Quickbooks showed these transactions as a bank transfer to her account was left blank.

Ms. Neil testified that she found a check dated December 29 that the Defendant wrote to herself for $1443.15, an amount identical to a recent payment to Louisville Tile. She said this transaction had not been entered into QuickBooks, and she entered it on January 10, while the Defendant was on vacation. She said the Defendant accessed QuickBooks on January 17 at 1:05 a.m. and changed the file to reflect that the payment was for two periods of contract labor and "something for Stamps.com."

Ms. Neil testified that also during the Defendant's vacation, she learned from her bank that a check had been processed for $1019.76. She said this amount was the same as an outstanding invoice with Kemper Design Company. When she learned from her bank that a check had been presented in this amount, she entered the payment into QuickBooks as being for Kemper Design Company. She later learned, however, that the check was made payable to the Defendant.

Ms. Neil testified that also during the Defendant's vacation, she found an envelope containing receipts in the Defendant's office. She said that some of these receipts were for transactions with the business's debit card that was issued to the Defendant.

Ms. Neil testified that one of the receipts in the envelope was for a purchase at Kroger on November 29 at 5:20 p.m. and reflected that it had been made with the Defendant's business debit card. She said the receipt noted purchases for grocery items for which the business would have had no use. She said the $34.61 transaction was entered into QuickBooks on December 3 using the administrator's account and that it was listed as a payment to Kroger for employee incentives. She said she did not authorize this purchase or enter it into QuickBooks.

Ms. Neil testified that there was a transaction in which $10.05 was transferred from the business's bank account to the Defendant's PayPal account. She said the PayPal receipt reflected that the transaction was for the purchase of a ballerina ornament and that she would not have purchased this item for the business. She said she did not authorize the Defendant to link the business's bank account to the Defendant's PayPal account. She said this

transaction was entered into QuickBooks on December 8 at 8:52 p.m. using the Defendant's account. She said it was listed as a payment to PayPal and categorized as cost of goods sold, which would reflect items sold in the business. She identified a second PayPal receipt reflecting a purchase by the Defendant of three ballerina ornaments for $10.24 on December 1. She identified banking records showing that the payment to PayPal came from the business's checking account. She said this item was entered in QuickBooks by the Defendant on December 8 as a payment to PayPal and was categorized as cost of goods sold.

Ms. Neil testified that she did not shop at WalMart or Sam's Club and would not have permitted the Defendant to shop at these stores for the business. However, she discovered a $30 payment to Sam's Club for a membership on November 30. She said this item was entered in QuickBooks by the administrator on December 3 to reflect payment to Sam's Club for dues and subscriptions. She also discovered a debit card transaction at Sam's Club for $130.08 on December 10 at 4:00 p.m. She said the receipt listed numerous grocery items and reflected that payment was made with the Defendant's business debit card. She said that a transaction in this same amount was entered into QuickBooks on December 30, was backdated to December 14, reflected payment to FedEx Freight, and was categorized as cost of goods sold. She identified a second receipt from Sam's Club, reflecting a $234.91 purchase made with the Defendant's business debit card. She said this transaction was entered into QuickBooks on December 30 at 10:00 p.m. using the administrator account. The payee was listed as FedEx Freight. She identified a WalMart receipt for $80.67 dated December 22. She said the purchase was made with the Defendant's business debit card. She said that this transaction was entered into QuickBooks on December 27 by the administrator as a payment to WalMart for showroom decorations. She said that the business closed early on December 23 and that she would not have purchased showroom decorations on December 22. She also noted that the purchase was made in Alcoa and was not near the business in Knoxville. She identified another WalMart receipt for items including a 32" flat CRT on December 26. The amount of the purchase was $466.60. She said the Defendant's signature appeared on the receipt and that the Defendant's business debit card had been used to pay for the purchase. She said the business did not have a 32" flat CRT. She said a transaction for this amount was entered in QuickBooks on December 30 by the administrator. The payee was listed as Mexican Handcrafted. She said her bank records identified that the WalMart where this purchase was made as being in Brunswick, Maine. She said the Defendant had flown to Maine to visit one of her children for Christmas. She identified a December 29 Sam's Club receipt for $129.46, of which $40.00 was for cash back. She said two items for $15.48 each were listed on the receipt that might have been used for the business but that the other items and the cash back had no business purpose. She said another employee entered this transaction into QuickBooks while the Defendant was on vacation as an uncategorized expense because it had been processed by the bank and they did

not know how to categorize it at the time. She said this purchase was made on a date the business was closed.

Ms. Neil testified that in reviewing her banking records, she discovered a $43.65 payment to Apple Computer on December 12. She said that she did not make the purchase and that the business did not have any Apple computers. She said this transaction was entered into QuickBooks on December 30 using the administrator account as a payment to Apple Computers for "Repairs Computer."

Ms. Neil testified that she found a receipt for $143.65 for Day Timers from Franklin Covey. She said the December 20 receipt reflected the purchase was made with the Defendant's business debit card. She said the Defendant gave some of the business's staff members Day Timers for Christmas as a personal gift from the Defendant. She said she did not authorize the purchase. She said she gave her employees a meal, show tickets, and cash for Christmas. She said the Franklin Covey transaction was entered into QuickBooks on December 30 as a payment to Franklin Covey and was categorized as office expense.

Ms. Neil testified that she found a packing list for a December 21 purchase of a men's NFL shirt from Foot Locker for $59.28. She said the business would have no need for this item. She said a transaction with a like amount was entered into QuickBooks on December 23 as a payment to UPS and was coded as cost of goods sold. The packing list reflected that it was shipped to the Defendant at Tile Sensations.

Ms. Neil testified that she found a $52.99 receipt for Borders Airport for a December 25 purchase. She said that there was an item entered in QuickBooks on December 30 by the administrator for this same amount and that it was coded as a payment to UPS and categorized as cost of goods sold.

Ms. Neil identified banking records for a November 18 debit transaction made with the Defendant's business debit card for $5.92. She said this item was entered in QuickBooks on November 28 by the Defendant reflecting a payment to Pilot and was categorized as automobile expense. She said that she sometimes had automobile expenses when she traveled to clients' locations but that she did not purchase gas at Pilot. She said that any employee mileage was reimbursed based upon a set rate per mile, rather than as a reimbursement for gas purchased. Ms. Neil identified banking records for a November 28 purchase at Pilot for $25.84. She said the administrator entered this transaction in QuickBooks on December 3 as a payment to Pilot for automobile expense. She also identified banking records for a December 6 debit at Pilot for $30.71. She said this item was entered into QuickBooks by the Defendant as a payment to Pilot in the automobile expense category. She identified banking records for another Pilot debit transaction for $24.90 on

December 8. She said this was entered into QuickBooks on December 13 by the administrator as a payment to Pilot in the automobile expense category. She said there was another Pilot transaction on December 27, a date the business was closed. She identified banking records showing this transaction was for $11.25. She said this transaction was entered into QuickBooks by the administrator on December 27 as a payment to Pilot for automobile expense.

Ms. Neil identified banking records for a November 23 debit card purchase of $37.45 from 1-800-SUNBEAM. She said Sunbeam sold items such as electric blankets, irons, and toasters. She said this transaction was entered in QuickBooks on November 28 by the Defendant as a payment to Sunbeam for building maintenance.

Ms. Neil identified banking records for a November 25 purchase of $31.75 at Weigel's in Maryville. She said an entry was made in Quickbooks on November 28 which listed the transaction at Weigel's and categorized it as "Barbara Uncategorized Expense."

Ms. Neil identified banking records for a November 28 purchase at JCPenney for $89.79. She said this was entered into QuickBooks on December 3 by the administrator as a payment to JCPenney for uniforms. She said that the only employee who was subject to a dress code purchased his own shirts and that she reimbursed him for the purchase.

Ms. Neil identified a November 30 packing slip from Laptops for Less for a PDA car charger. The amount of the sale was $59.00. She said that neither she nor the business owned a PDA. She said that the Defendant had a PDA but that the business would not have needed a car charger for the Defendant's PDA. She said this transaction was entered into QuickBooks on December 8 by the Defendant as a payment to Laptops for Less for computer repairs.

Ms. Neil identified a receipt from Pancho's Mexican Restaurant in Maryville. The receipt lists a pre-tip amount of $26.44 and has "30.–" handwritten in the "Total" line. Ms. Neil said that QuickBooks contained an entry made by the administrator on December 13 as a purchase by the Defendant at Pancho's. She said the transaction was entered as travel and entertainment. She said the Defendant's job duties would not entail her taking anyone to dinner in Maryville. She said the bank records reflected that the purchase amount was $29.80, rather than $30.00.

Ms. Neil testified that she did not know the PIN number to her own debit card. She said there would have been no business reason to withdraw cash from an ATM machine. She identified a receipt she found in the Defendant's office for an ATM withdrawal November 11 for $200. She said there was an entry in QuickBooks made by the administrator for this

amount under her name as a shareholder loan. She said she did not make this withdrawal. She identified two other receipts for ATM withdrawals of $100 and $20 on November 18. She said there was a $120 transaction entered in QuickBooks by the administrator on December 5 as a payment to her for shareholder loans. She identified another ATM receipt for a $200 withdrawal on December 3. She said the administrator made a QuickBooks entry on December 5 reflecting a $100 payment to her for shareholder loans. She said there was a $200 entry listed as ATM and categorized as petty cash. She said that the business had a petty cash box but that it was rarely used and there would be no reason to keep large amounts of money or large bills in the box. She said a check would be cashed if petty cash were needed. She identified another ATM withdrawal receipt for $200 on December 20. She said there was a December 20 entry in QuickBooks made by the administrator reflecting that she received $200 for shareholder loans. She identified another ATM receipt from a WalMart in Brunswick, Maine for $201.50. She said the receipt reflected that the Defendant's business debit card was used for the transaction. She said the administrator made a QuickBooks entry on December 30 for this amount for "miscellaneous." She said that she never sent the Defendant to the ATM to get money for her or the business and that the Defendant never discussed with her the need to make ATM withdrawals for business use.

Ms. Neil identified a November 30 Office Depot receipt for $103.74. She said that some of the items appeared to be legitimate business expenses but that there were two lap desks purchased for $24.99 each that would not be used in her business. She said the entire amount was charged to the business. A QuickBooks entry reflected that the entire amount was entered as a payment to Office Depot for office supplies. Ms. Neil said the cost of the lap desks with tax was $54.60.

Ms. Neil identified a December 15 receipt for a reimbursement payment to the Defendant for various office supplies. One of the amounts listed, $56.15, had no explanation for its purpose, and Ms. Neil said she was not able to find a receipt for this amount. The entire amount of the reimbursement was $275.43. She said that on January 12 she made an entry into QuickBooks for this item showing that the Defendant was issued a check for the entire amount.

Ms. Neil identified UPS receipts for shipments made to Topsham, Maine, on December 9, December 12, December 15, December 21, and December 23; to Louisville, Kentucky, on December 12; and to Surprise, Arizona, on December 21. She said the Defendant's son and grandchild lived in Maine. She said her business was charged $128.01 for these shipments. She said the Defendant admitted on January 17 that the shipments were hers. She said that the Defendant had not told her about the shipments previously and that they had been entered in QuickBooks as legitimate business payments to UPS.

Ms. Neil testified that she purchased gift cards from her church as part of a fundraising effort for various charities and the school associated with the church. She said the gift cards were to be used for business purposes and were purchased with business funds. She said they were stored in a safe to which the Defendant and other employees had access.

Ms. Neil identified a December 9 receipt from Office Depot for a purchase of $260.20. The receipt reflected that gift cards totaling $177.81 were used to pay for the transaction, with the balance of $82.39 being paid by a debit card. She said her banking records reflected a debit for this amount. She said there was a QuickBooks entry made by the administrator on December 12 reflecting $82.39 being paid to the Defendant for shareholder loans.

Ms. Neil identified a December 9 Home Depot receipt for purchases of $36.07 and cash back of $50.00. A $25.00 gift card was used, and $63.07 was paid with the Defendant's business debit card. She said there was a QuickBooks entry by the administrator on December 13 reflecting a payment of $63.07 to Home Depot for office expense. She noted that the transaction took place in Maryville.

Ms. Neil testified that she noticed that many of the transactions in question were entered in QuickBooks on December 13 and 30. She said she also noted that the QuickBooks entries were made within a few minutes of each other on those dates. She said the business was closed on December 30.

Ms. Neil identified a ledger listing the purchases the Defendant admitted making over Thanksgiving weekend, the repayment made by the Defendant, and additional purchases that were later made by the Defendant and entered into the shareholder loan account. The balance was $1289.62. She said the balance reflected a $900.00 check the Defendant wrote to the business as a reimbursement. She noted that the Defendant's personal check was drawn on Maryville Municipal Credit Union. She also noted that the Defendant's check was written the same day that one of the $1200.00 checks the Defendant wrote to herself was deposited. She noted that one of the items on the ledger was a $268.30 payment to Travelocity. She said the Defendant told her that the Defendant had been able to budget the trip to Maine. She said she had no idea business funds were being used for the Defendant's travel expenses.

Ms. Neil testified that she spent many hours reviewing the records with her accountant, Terry Chervenak, and an assistant during the Defendant's vacation. She acknowledged that she had made changes in QuickBooks for the first five or six items she found that were miscategorized. She said that she stopped making the corrections on the advice of Ms. Chervenak, who wanted to preserve the Defendant's actions. She said that in

any event, the audit trail memorialized any changes that were made to each transaction. She acknowledged that the audit trail reports reflected that she had viewed all of the transactions in question after they had been entered by the Defendant, and she said she accessed them during the Defendant's vacation when she was trying to understand the accounting irregularities.

Ms. Neil testified that she and her accountant decided to call a meeting to discuss their concerns with the Defendant upon the Defendant's return on January 17. She said Ms. Chervenak took the lead in questioning the Defendant about the transactions. She said that when Ms. Chervenak showed the Defendant some of the checks payable to the Defendant, the Defendant said, "Well, I don't know how that could have happened. They are clearly made payable to me. I don't know how it could not be in Quick Books[,]" or she said "I don't know." She said the Defendant appeared to be distressed, was crying, and was running her fingers through her hair. She said the Defendant kept professing, "I don't know." She said the Defendant claimed the ATM withdrawals were for petty cash. She said the Defendant was able to explain some purchases as being for the business, admitted that some of the purchases were for her personal use, and said she did not know how many of the QuickBooks entries had been made incorrectly. She said the Defendant admitted making personal purchases with gift cards belonging to the business. She said the 32" CRT screen purchased in Maine and the DVD player were among the items the Defendant admitted purchasing for her own use.

On cross-examination, Ms. Neil acknowledged that blank, signed checks and the gift cards were kept in a safe at the business and that employees other than the Defendant had access to the safe. She admitted that other office employees had access to QuickBooks at some level. She said that despite the fact she had access to QuickBooks with the administrator password, she normally logged in as Jen or Jen2. She said the administrator mode was normally used to make accounting entries or to create a new user account. She said only she and the Defendant were able to access QuickBooks from home. She acknowledged that after the Defendant admitted making personal purchases with the Defendant's business debit card over the Thanksgiving weekend, she had no further discussion with the Defendant about using business funds for personal use. She said it never occurred to her that the Defendant would continue to purchase items for the Defendant's own use with her business debit card. She said the timing of some items being entered into QuickBooks by the administrator led her to conclude that the Defendant must have been the person who made the entry because the Defendant admitted her responsibility for some of the purchases, and many of the disputed entries were made in close proximity to the ones the Defendant admitted.

Terry Ann Chervenak, a Certified Public Accountant, testified as an expert witness in general accounting. She said she had been Tile Sensations' accountant since late 2004 or early 2005. She said her firm supported clients who used QuickBooks software as their accounting system. She said she was not aware of any way to modify a QuickBooks audit trail. She acknowledged that before 2005, the audit trail could be turned off in QuickBooks.

Ms. Chervenak testified that she was asked in early January 2006 to investigate irregularities in Tile Sensations' accounting. She said both she and one of her employees helped Ms. Neil review the records. She said she advised Ms. Neil not to make changes in the records when she became aware that Ms. Neil was correcting errors in Tile Sensations' QuickBooks records. She said they made a list of items about which they had questions, which she assembled into a spreadsheet to be reviewed with the Defendant.

Ms. Chervenak testified that she and Ms. Neil met with the Defendant on January 17. She said that both she and Ms. Neil's attorney thought she should be the person to conduct the meeting and that she did so. She said she began by questioning the Defendant about the $1200 checks that were entered as a payment to Ms. Neil but were payments to the Defendant. She said the Defendant became flustered and said, "Well, that's impossible, I don't know how that could have happened. . . . I know I entered that into Quick Books as Barbara Riggs, the check to Barbara Riggs as Barbara Riggs." She said she did not get very far into the questioning about these entries because the Defendant became panicked and upset and was crying. She said she changed the subject of the questioning to another area. She said that they reviewed items line-by-line for over four hours and that the Defendant said, "I don't know; I don't know," throughout the process. She said the Defendant was able to answer questions about some of the charges. She said that the Defendant admitted that many of the purchases had been for the Defendant's personal use, that the Defendant said she did not know why they were not coded properly in QuickBooks, and that the Defendant stated she would reimburse the business for those transactions.

On cross-examination, Ms. Chervenak acknowledged that she had never performed a formal audit for Tile Sensations. She said audits were very expensive. She also admitted that she was not involved in the day-to-day business at Tile Sensations. She agreed that the Defendant reviewed with her each transaction about which she had questions. She admitted that the audit trail reports had not yet been generated on January 17 but said that they reviewed QuickBooks entries with the Defendant that day.

The Defendant did not present proof. After receiving the evidence, the jury found the Defendant guilty of theft of property valued at more than $10,000 and less than $60,000.

At the sentencing hearing, the court addressed a prior theft case for which the Defendant had been granted a diversion. The court revoked probation in that case and imposed judgment for theft of property valued at more than $1000 but less than $10,000.

The court received the Defendant's presentence report. It reflected that the Defendant was a high school graduate with some college education. She had three adult children. She had a pending theft charge and some prior misdemeanor convictions. The presentence report also contained a lengthy statement submitted by the Defendant in which she detailed personal expenses of Ms. Neil's that were paid with Tile Sensations' funds and claimed that she had Ms. Neil's permission to use her business debit card for personal purchases as long as she kept up with the amount.

Ms. Neil gave a victim impact statement in which she detailed the difficulties she had encountered as a result of the Defendant's theft from her business. She said the ordeal had required that she devote time to matters related to the case or working extra hours to make up for the money lost, rather than to her family, her employees, her clients, and charities she supported. She said she had not been able to give her employees raises or Christmas bonuses because of the loss. She said she was not able to provide financial support to a charity for Haitian children, as she had previously. She said that it had been necessary to pay vendors late and that her landlord allowed her not to pay rent for a year. She said she had only recently been able to repay the landlord. She said that she had been notified in February 2008 that a check had been dishonored at Sam's Club in Chattanooga and that the purchase had been made by someone using Tile Sensations' membership. She said she learned that the Defendant had maintained the Sam's Club membership in the business's name and had presented a forged check.

The Defendant offered an allocution in which she apologized to Ms. Neil and the employees of Tile Sensations. She said she wanted to repay the money she had taken. She admitted she had taken money from a previous employer and said she had paid restitution immediately in the criminal case that resulted from that theft. She said she had worked hard in the past three years to rebuild her life. She said she had not been employed as an accountant since working at Tile Sensations, although she admitted she had worked for one employer reconstructing financial statements for tax purposes. She said she now was working as an office manager. She said she would never steal from anyone again.

The court applied the following enhancement factors:

(1) The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range;

-12-

. . .

     (3) The offense involved more than one (1) victim;

. . .

     (6) The personal injuries inflicted upon, or the amount of damage to property sustained by or taken from, the victim was particularly great;

. . .

     (13) At the time the felony was committed, one (1) of the following classifications was applicable to the defendant:

     (A) Released on bail or pretrial release, if the defendant is ultimately convicted of the prior misdemeanor or felony;

     (B) Released on parole;

     (C) Released on probation;

     (D) On work release;

     (E) On community corrections;

     (F) On some form of judicially ordered release;

     (G) On any other type of release into the community under the direct or indirect supervision of any state or local governmental authority or a private entity contracting with the state or a local government;

     (H) On escape status; or

     (I) Incarcerated in any penal institution on a misdemeanor or felony charge or a misdemeanor or felony conviction[.]

T.C.A. § 40-35-114(1), (3), (6), (16) (Supp. 2009). The court imposed a sentence of six years to be served on probation. The court ordered the sentence to be served consecutively to the Defendant's one-year sentence for the prior theft. The court ordered restitution of $11,603.22 and stated that the amount of restitution was subject to modification based upon the State's request for a further hearing on the final amount.

The court later heard a motion filed by the State seeking modification of the restitution amount. At that hearing, Ms. Neil testified that she had incurred accounting fees and legal fees as a result of the Defendant's actions. She said she had discovered additional purchases made by the Defendant for personal use that were not subject to the proof at trial, although some of these items were not within the period of time covered by the indictment. She

presented exhibits which listed her total loss as a result of the Defendant's actions as $31,880.84, which included accounting fees of $16,696.70 and legal fees of $861.03.

The court filed a written order in which it set restitution at $28,600.95, reflecting the amount of the theft and the accounting and attorney's fees. The court considered the Defendant's assets and financial obligations and set the Defendant's monthly restitution payments at $250.

**I**

In her first issue, the Defendant challenges the sufficiency of the convicting evidence. Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This means that we may not reweigh the evidence, but we must presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Any questions about the credibility of the witnesses were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

The relevant statutes provide, "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent" and "the value of the property or services obtained is ten thousand dollars ($10,000) or more but less than sixty thousand dollars ($60,000)[.]" T.C.A. §§ 39-14-103, -105 (2006).

The Defendant argues that the State failed to prove that the Defendant was the person who made the questioned entries with the administrator's QuickBooks account, that there was no proof the Defendant intentionally miscoded her personal purchases in QuickBooks to make them appear to be legitimate business expenses, and that the gift cards Ms. Neil claimed were used by the Defendant for personal purchases were stored in a safe to which other employees had access. Reviewing the facts in the light most favorable to the State, the evidence shows that the Defendant made numerous purchases for her personal use with the business's funds. After she admitted making the Thanksgiving weekend purchases, she agreed to reimburse Tile Sensations, but she continued to make new purchases for which she never made any reimbursement before she was questioned about them on January 17. The Defendant made entries in QuickBooks which concealed the nature of her personal purchases. She issued checks to herself in amounts that matched checks paid to vendors, and she made payments to herself for shareholder loans even though she was not an owner of the

business. She admitted that some of the transactions were for items for her personal use, and some of the QuickBooks entries for these transactions were entered using the administrator's Quickbooks account within minutes of other entries she disputed were her personal purchases. The Defendant and Ms. Neil were the only people who knew the administrator's password, and Ms. Neil testified that she did not make the entries which she attributed to the Defendant. Ms. Neil presented proof of losses to her business of $11,603.22. Ms. Neil and Ms. Chervenak testified that the Defendant admitted making many of the purchases in question, including purchases with the gift cards. The jury assessed Ms. Neil's and Ms. Chervenak's credibility favorably and accredited the State's proof. The evidence was sufficient to support the Defendant's conviction, and she is not entitled to relief on this issue.

## II

The Defendant argues that the trial court erred in applying three of four enhancement factors because they were not found by a jury beyond a reasonable doubt. The Defendant argues that Tennessee's sentencing scheme is unconstitutional under Blakely v. Washington, 542 U.S. 296 (2004), and Cunningham v. California, 549 U.S. 270 (2007). She urges this court to impose the minimum sentence of three years.

The Defendant has failed to account for the fact she was sentenced under a version of the sentencing act that had been amended to comply with constitutional dictates. The 2005 Act removed the provisions requiring the trial court to make factual findings upon which it could then enhance a sentence from the minimum, presumptive sentence. Instead, the new act provides that the court shall set a sentence within the range and that in doing so, the court shall consider that the minimum sentence should be imposed and that the length should be adjusted as appropriate for any enhancement and mitigating factors. T.C.A. § 40-35-210(c). In doing so, the court "shall consider, but is not bound by" certain "advisory sentencing guidelines," which include that the sentence should be adjusted, as appropriate, for any enhancement or mitigating factors shown. Id., § 40-35-210(c)(2). The Defendant was sentenced under the 2005 Act, not the previous version. Thus, the trial court did not err in applying enhancement factors without the factors having been found by a jury beyond a reasonable doubt. The Defendant is not entitled to relief.

## III

The Defendant argues that the trial court erred in ordering her to pay restitution for Ms. Neil's accounting and attorney's fees. She argues that the accountant's fees were not reasonable out-of-pocket expenses incurred by Ms. Neil and that the accountant's statement of her fees was too brief to substantiate the "unreasonably high sum." She also argues that

the attorney's fees amount to a payment to a special prosecutor, which is specifically exempted by the restitution statute.

Generally, restitution may be ordered as a component of sentencing pursuant to Code sections 40-35-104(c)(2) and 40-35-304. Additionally, in theft cases, restitution is mandated:

> Whenever a felon is convicted of stealing or feloniously taking or receiving property, or defrauding another of property, the jury shall ascertain the value of the property, if not previously restored to the owner, and the court shall, thereupon, order the restitution of the property, and, in case this cannot be done, that the party aggrieved recover the value assessed against the prisoner, for which execution may issue as in other cases.

T.C.A. § 40-20-116(a). Section 40-20-116(a) contemplates restitution to the victim of the property itself or the value of the property, whereas section 40-35-304 allows restitution for the victim's "pecuniary loss," consisting of special damages and "[r]easonable out-of-pocket expenses incurred by the victim resulting from the filing of charges or cooperating in the investigation and prosecution of the crime . . . ." T.C.A. § 40-35-304(e)(2). Section 40-35-304 also states that in determining a proper amount and method of payment of restitution, "the trial court shall consider the financial resources and future ability of the defendant to pay or perform." T.C.A. § 40-35-304(d). If the trial court determines that the proper restitution amount pursuant to section 40-35-304(d) is less than the amount established by the jury under section 40-20-116(a), the court should establish the deficiency amount, which is collectable by execution. See T.C.A. § 40-20-116(a); State v. Patricia White, No. W2003-00751-CCA-R3-CD, Gibson County (Tenn. Crim. App. Oct. 15, 2004) (relying on State v. Charles Chesteen, E1999-00910-CCA-R3-CD, Cocke County (Tenn. Crim. App. June 8, 2000)).

We consider first the propriety of the award of attorney's fees. Ms. Neil testified that when she initially discovered the Defendant's actions, she consulted with her attorney about how to proceed, and the bill for her attorney's services was $861.03. The Defendant argues that Code section 40-35-304(e)(2) specifically exempts from recovery as restitution any payments to a special prosecutor and that Ms. Neil's consultation with her attorney in a private law firm was a payment to a special prosecutor.

The Defendant is correct that payment to special prosecutors cannot be recovered as restitution. However, she has not explained how Ms. Neil's private attorney acted as a special prosecutor. Code section 8-7-401(a) permits a crime victim or the victim's family to employ a special prosecutor to act as co-counsel with the district attorney general. Notice to the Defendant and a hearing is required before a special prosecutor will be allowed to

-16-

participate in any criminal hearing, trial, or other proceeding. T.C.A. § 8-7-401(b)(1). Ms. Neil testified that when she first discovered the Defendant's actions, she consulted with her attorney about how she should proceed. There is no indication in the record that this private attorney was ever involved as co-counsel with the district attorney general in the prosecution of the criminal case. Further, the attorney's fees incurred were a reasonable expense for a victim who had suffered a substantial loss as a result of criminal activity, and the trial court did not err in awarding restitution for the attorney's fees.

The Defendant also challenges the accounting fees. Ms. Neil testified that she worked extensively with Ms. Chervenak trying to reconstruct what had happened. She presented a $16,696.70 bill for the hours Ms. Chervenak spent conferring with Ms. Neil, reviewing the business's records, meeting with the Defendant, preparing for trial, attending the trial, preparing additional information for the sentencing hearing, engaging in various other communication associated with the case, and for copying charges. The one-page document does not contain an itemization by date, time, and activity. It is a summary statement on the accountant's letterhead of the categories of tasks performed and costs incurred. Ms. Neil testified that she had received and reviewed more complete documentation of her accountant's work and that the amount reflected on this statement was related solely to the accountant's work on the criminal case and did not include any of the normal accounting fees the business incurred.

The Defendant argues that "hours of forensic accounting" were not necessary to determine what happened. She also complains that the trial court erred in including the accounting fees in the restitution amount because the document submitted in support of the fees was too speculative and did not list the number of hours assigned to the listed tasks or the hourly rate for each task.

The record reflects that the Defendant, in an effort to hide her actions, made numerous convoluted and erroneous entries in Tile Sensations' accounting system. The Defendant used various forms of payment, including cash, checks, debit cards, gift cards, and PayPal. Ms. Neil testified that she handed the day-to-day accounting over to the Defendant and that the business was better served with her time being devoted to selling tile rather than performing the tasks for which the Defendant was hired. The Defendant's actions were complex, and Ms. Chervenak's testimony and written summaries of the transactions were essential to the prosecution of the case. Accounting fees were a reasonable, necessary expense in this case.

The remaining question is whether evidence of the amount charged was detailed enough to form the basis of a restitution award. The accountant's summary statement has several general categories of work performed and lists the total amount for the services rendered. Although there was no itemization within the categories, Ms. Neil testified that

she had received more complete documentation from the accountant and had reviewed it. She said the document that was received as an exhibit was a summary of the information she received and reviewed. Further, the evidence showed this case to be a complex case which required intensive, detailed review of the records in order to determine the nature and extent of the Defendant's actions. The State presented proof that Tile Sensations was already a struggling business when the Defendant began stealing from the business, and the Defendant's actions caused a dire financial hardship that required Ms. Neil's hard work over an extended period of time to keep the business open. The extent of the accounting work necessary in this case is evident from the proof, which also supports the accounting fees charged for that extensive effort. The trial court did not err in ordering restitution for the accounting fees.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE